in the case before you today. This case presents two evidentiary questions. The first is whether the district court abused its discretion in permitting extensive evidence about a prior stop in Mr. Ramos' drug smuggling trial. The second is whether the district court abused its discretion in allowing the government to produce extensive profiling testimony that basically equated Mr. Ramos with a generic drug smuggler rather than permitting the jury to make a decision about whether Mr. Ramos was a drug smuggler on the evidence regarding Mr. Ramos. Now I'm going to take the first issue first. It was very hotly litigated at trial was that Mr. Ramos had been stopped about six weeks before he was arrested on this drug offense. He was stopped near Round Rock, Texas. During the stop, he consented to a search of his car. That search eventually ended up back at the Round Rock police station where the officers dismantled his truck and found a hidden compartment. When did the dog alert? The dog alerted before they went back to Round Rock. So the dog alerted at the scene. Did it alert in his presence? There's no evidence whether Mr. Ramos was present at the time that the dog alerted. However, the dog is a passive alert dog. So what that means is that the dog stops when it smells drugs. I don't believe that Mr. Ramos could know that a dog stopping was an alert. It's not like he points on that bird. I read the closing arguments and in the closing arguments, the government's attorney focused on changing of the license plates to show, to try to hide the identity of the car. In fact, nothing was said about possibility of drugs or a hidden compartment that the dog alerted to until the defense counsel brought it up in closing arguments. So the U.S. attorney seems to be consistent with using evidence of the changing, the recent changing of a license plate at the time of the stop. And then another changing of the license plate prior to the arrest at the border, why wouldn't that be probative of some kind of scheme or design so that the use of this vehicle wouldn't be detected, so that the vehicle wouldn't be identified as a vehicle that may have had a hidden compartment. Not that he is guilty of an offense in the past, not a bad act to show that he's guilty of this act, but evidence and behavior that suggests that he's trying to keep secretive this vehicle so that when he goes back and forth, I lived along the border in McAllen, and every time we go over, you know, they take your license plate's number and they look at it when coming back. Well, if your license plate number is changing, they don't know it's the same truck. If your license plate number is changing, they may not know that you have a hidden compartment that was found in it previously. Why wouldn't that be relevant? Your Honor, as I said in my briefing, it's possible that the changing of the plates was relevant. It's possible that an agent could have gotten up and said, we stopped this guy in Round Rock. He has new plates since then, right? And then on cross-examination, we could have said, did you arrest him? Did you blah, blah, blah, and kind of limit that to what prior bad act evidence usually is, which is a brief recap of prior conduct. But there were a lot of moving pieces in this case. And instead of looking at the evidence so that it was strictly confined to being relevant to the offense that he was charged with, which is what this Court has required, the trial court just opened it all up and said, you know, I'm looking at this much more broadly and I think the whole shebang is relevant. So what ended up coming in was not just evidence that Mr. Ramos may have been trying to hide something. It was three fact witnesses. It was an hour, well, I don't know if it was an hour, the version I have. It was a videotape of Mr. Ramos being questioned and having his officer who came in and was permitted to testify for the first time in Mr. Ramos' Round Rock case that his drug dog is infallible. My drug dog never makes mistakes. There had to be drugs. There had to be drugs at a subatomic level. At the time that the argument was made, you preserved your argument objecting to this other act's evidence. Perhaps I'm wrong, but I thought that the government's attorney, their rejoinder to that, well, it shows the license plate changing and all this stuff. Things that you yourself admitted would be relevant. Could be. Was that his argument or did he say, well, we're entitled to show that the dog sniffed and blah, blah, blah? Yes. Judge Ezra actually tried to get out of this whole issue by giving the prosecutor an opportunity to just say we don't need this evidence. The prosecutor was very firm from the beginning all the way through that he needed all of the evidence in, including the discovery of the compartment. He was very clear from the very beginning that it was relevant to knowledge. Now if we look at the individual components of this and we say clearly, or at least I would say clearly, I can't speak for the panel, that the evidence about the changing was relevant. The evidence that they asked him about whether he changed those, they brought up to him that those front seats had been moved. Doesn't that put him on notice that they're aware that those seats had been moved and it would take, you know, what I mean? I guess that's what I'm saying. Do they have to show that he knew about the finding of the compartment? If I'm a bad guy and I get stopped for three hours and they ask me about those chairs and whether they've been moved and it took hours to move them and I'm the owner of that car and they didn't give me that car and then they say, well, we know what was in it, you know what was in it, and I'm involved in that kind of stuff, don't I want to change the, you know, doesn't that give me reason, another reason to change the license plates and all those other things? Well, let's compare this to a couple of decisions that this Court has decided in this area. So I think Judge Dolley and Judge Jones, you were both on panels in these decisions. So in Gutierrez-Mendez, which was a very thoughtful opinion by Judge Smith, the issue in that the government had on a prior opportunity harbored aliens, at a prior occasion harbored aliens. The evidence that the government had to show that he had in fact done so was, in my opinion, better than the government's evidence in this case. The evidence was that the individual was stopped, the officer leaned into the car and smelled a strong smell of human sweat, which according to his testimony was indicative of human trafficking. There was a woman lying in the bottom back of the chair, back of the car, who the officer testified in his experience appeared to be hiding. The defendant, Mr. Gutierrez, said that he had picked up the two women when he saw them standing in front of a church. The officer said, I've driven this highway, you can't see that church from this highway. At that point, the defendant got angry and defensive and shut down. So that was the circumstantial evidence regarding whether he had, oh I'm sorry, and finally the women admitted that they were aliens. So that was the circumstantial evidence in front of Judge Smith when he wrote the opinion in Gutierrez-Mendez. And he said, not good enough. Not good enough to show that this individual knew. And I think the reason is, because I agree with you, that seems a little counterintuitive. I think there's a distinction between what was being used in that case to prove the charged offense and what is relevant not to show the commission of the charged offense, but to show his efforts to conceal. In your case, it doesn't have anything about efforts to conceal. It has to do with he's had these people in there. He should have known that they were aliens. The court said, well, there's nothing that he would have known that they were aliens. Therefore, we can't use that evidence to prove that he is now knew about in this, in the present case. Well, that's not this case. They're not relying, in fact they didn't even argue that the dog had sniffed. He didn't argue that he had had drugs before. In his closing arguments, he says, you know, he knew about the chairs had been moved. He changed the license plates. He did this. This is all, you know, and it was used to show that somebody wanted to hide. In your case, they weren't trying to hide the existence of a van. They were trying, in this case, they're trying to show that this van had hid the existence, that this truck had a compartment, that it had a license, that he did all these things consistent with keeping it secret. Now, don't you think there is some kind of distinction there? I think that there is some kind of relevance, assuming it could survive 403, to the license plate changing. I do. I don't think I have a principled argument that there isn't. I could not disagree more about the finding of the compartment and especially the dog sniff. Well, if I know, let me, if I know, she answered, if I know that the cops have stopped me and I know that the chairs have been moved and they've told me and they asked me about when did you move the chairs, do I have to know that they found the compartment if it's my car? If I'm a guilty person, I'm not going to take a chance. I'm not going to say, well, they didn't find it. I'm going to say, well, you know, they might have found it. I better change the license plates. Well, I think the question is guilty of what? And if Mr. Ramos didn't know he had a hidden compartment, maybe he had a joint under his thing. Maybe he just didn't like the fact that he had been stopped for three hours. He'd been asked to give up names of his friends. He didn't want to get stopped again. So I think the answer to your question is yes. He does have to know what exactly the prior bad act is, especially when under this court's precedent, probativeness is a function of similarity, right? And so what this court requires in knowledge cases is that the defendant have engaged in exactly the same state of mind on the prior occasion. Well, you don't know that unless you know that Mr. Ramos knew about that compartment. And I take your point . . . But, you know, the other point here is that the reason they found the compartment was that there were anomalies in the floor. It looked as if it had been tampered with, which were surely as visible to him as they were to the officers, number one. And number two, part of the evidence was that he was giving incredible, not credible, internally conflicting stories about where he had been, where he had stayed, and so on. I'm so glad you asked that because I don't want to end without addressing his statements at the stop and the condition of his car. He was bearing salvage plates. The truck was not in good shape. It had been, by definition, taken apart and put back together. Before he put those plates on, it was a salvaged truck. The officers knew it was a salvaged truck. How do you know what a salvaged truck is? It's in the record. I can find the page type for you, but the officer testified. So the officers knew he was driving a salvaged truck. So how probative is it that there were new screws or that the seats had been moved? And, in fact, Mr. Ramos, all Mr. Ramos told the officers was that he had not moved the seats. That could very well have been a true fact and the anomalies could have been a result of this being a salvaged vehicle. Now, as to his statements, I really encourage you to read Government's Exhibit 16A. It is a transcript of this stop. The government has used hyperbolic language to describe Mr. Ramos' statements at the scene, and they simply are not borne out by the record. What Mr. Ramos said is that he had come from Mexico to Fort Worth. It seems clear to me that he stayed on the way up and then drove the rest of the way into Fort Worth. He was asked where he stayed. He said here at a Ramada. He was on IH 35. I did a brief Google search yesterday, and I'm telling you there are a bunch of Ramadas in between Austin and Fort Worth on IH 35. Now, he did use the word here, and I really want to—almost out of time—I really want to emphasize, look at his answer— We'll give you another minute. Look at his answer when he's asked where he had come from, like the second question he was asked on page one of the exhibit. He says, here at Fort Worth. The use of the word here in Mr. Ramos' idiom is not very significant because he was not in Fort Worth. He was miles from Fort Worth, and yet he said, here in Fort Worth. It's not true that he didn't have a change of clothes. It's certainly true that he didn't have luggage. It was an overnight trip. He may not have wanted to give up his friend's name, but it's not true that he couldn't remember it when he was asked. He said, Carlos Ramirez, I encourage you to look at the Fort Worth directory for Mexican restaurants that serve tacos. The number of restaurants that start with an L or a LOS and then a word that begin with the letter M is immense, and Mr. Ramos told the officers he could not remember the name of the restaurant. He thought it was LOS—I'm going to screw it, mess it up, so I'm not going to say it. He thought, he gave a name that he thought it was. So again, I'm not saying that the officers didn't have some reason to look into Mr. Ramos. What I'm saying is that when you are using a prior bad act to help prove, bolster a case on knowledge that is not the best case on knowledge that's out there, you have to be really careful. The words that this Court has used is strictly relevant to the purpose for which you are admitting it, and that is not the case here. In essence, Mr. Ramos was tried for two offenses. The Round Rock evidence took an entire half of a day. He was tried for two offenses at his trial, and the rule doesn't permit that, and neither does fairness. Counsel, we used—I used up a lot of time. Just so that you preserve it, you rely on your brief for your second point. I do, and I don't want you to think by not addressing it first that that's not an issue I'm committed to. I very much—I think that the question of whether the error is plain is in play, but I very much believe that there was egregious error committed in the profiling area. Thank you, Ms. Coffar. Thank you. DeRay? Good afternoon. I'm Tad DeRay for the government. May it please the Court. Despite what Ms. Goldthorpe just said, the appellant in this case was not tried for two offenses. The traffic stop in the hidden compartment was properly admitted under 404B because it served three legitimate 404B purposes. It was used to prove the appellant's knowledge, it was used to prove planning, and it was used to prove preparation. These are legitimate purposes, and they were undergirded by a sufficient showing of evidence that— Knowledge of what? Knowledge of the compartment, knowledge that there was drugs, had been drugs in it? What knowledge? What specific knowledge? Your Honor, the knowledge to which I'm referring is the knowledge of the hidden compartment, which was proven, you know, by all kinds of circumstantial evidence from that stop. In the appellant's brief, they talk about the bad act that we wanted to— Counsel, to play devil's advocate, opposing counsel has referenced the case from this circuit where aliens were found in a person's van. There's no doubt that there were aliens. There was no doubt that he was driving it, and there wasn't any evidence that he knew that they hadn't just—he hadn't just picked them up along the highway, and we said that there was a lack of evidence to show that he knew that there were aliens. If they didn't even find—if the drug sniffed and there wasn't anything there, and in the other case they actually found the aliens, and in the case that they found the aliens, we said there's nothing to show that he knew there were aliens. How does—how does the compartment being there prove that he—I mean, just the fact that the police found it show that he knew that they found it? That's a very good question, Your Honor. There are all kinds of—there's all kinds of evidence that shows that he had some circumstantial knowledge. One is the statements that he gave during his stop. Those kind of statements can be used to infer knowledge, and they were, you know, multiple. He told the cops that he had stayed, as Ms. Colthorpe said, at a Round Rock—here—at a Ramada here in Round Rock, but there's no Ramada in Round Rock. Our officers checked at the Ramada— Did he say Ramada—did he say a Ramada here in Round Rock? Did he add the words in Round Rock? No, Your Honor. He said Ramada here. So he didn't say what you said he said. He said that he'd stayed at a Ramada here, and in addition to that, he— Well, that could mean here in the United States. If he's a Mexican citizen, he comes over here. Sure. Point taken, Your Honor. If he was here, I don't know. Point taken, Your Honor. There was—there was much more to his inconsistent statements, though. He had—he gave this shifting timeline. As he spoke to Officer Morales when he was stopped, he told Officer Morales that he had left Round Rock that morning to go up to Fort Worth to go shopping, and it was only 1.30 in the afternoon. So for that story to have fit, he would have had to have gone up to—gone up to Fort Worth to go shopping, left Fort Worth by 10 or 11 in the morning to get back to Round Rock, and he had no evidence of having shopped. There were no bags. Didn't look like there were any purchases. He—during that—during that interview, he changed that story and said, oh, actually, he'd been in Fort Worth and then went shopping there and then came down, and then he sort of shifted off from that and said, actually, in fact, I went up to Fort Worth and I met a friend for some tacos. But when he was pressed, he couldn't at first remember the name of the taqueria, he couldn't remember the name of his friend, and he didn't have any contact information for this friend or any way to get in touch with him, just said, oh, he knew I'd be there. There were a couple other things. Did he know that—forget about whether he—whether they specifically told him that there was a compartment, that they had found a hidden compartment. Did he know that a drug had alerted him? He did. He did. While he was out there, and it's actually—it's on one of the videos—I didn't play an hour of video at trial. I played maybe 10 minutes, cumulatively. During that video, he was standing by the police car when the drug dog alerted him. He—actually, I believe it was Officer Morales. He asked Officer Morales what was going on. So he saw the drug dog alert. He saw the officers search that truck while it was on the side of the road, and then he went back to the station. Well, you tell me two different—ask one question, and you gave me a different answer. You said he saw the drug dog alert. Was there anything to show he knew that the dog was alerting? I mean, I go hunting with dogs, and some people don't know when they're pointing and when they're not pointing. What is it that let him know that the dog was alerting and it was alerting to drugs? Did they tell him? Let's figure out. The dog—I forget exactly what the dog's change in demeanor was, but there was a change of demeanor, and after it happened, either he—I think he got really excited when he got towards the center or something like that, and there was on one of the videos— He saw the dog get excited. Yes, Your Honor. And that means that he knew that the dog had alerted to drugs. That does not. Not that he had a can of Alpo in there. No, Your Honor. Certainly, he could—if there was a can of Alpo in the center console, that's a legitimate reason why the dog would get enthusiastic. But it's inferential that he—I would raise the inference that he knew there wasn't dog food in the car. He didn't have a rawhide in there. He knew what was going on. Also, there was—and this was an Officer Mount's testimony— there was the issue of the wobbly cup holder. Officer Mount's one of the officers in Round Rock, and he said that as soon as he started searching the truck, he touched the cup holder, and it sort of moved. It wobbled. He was able to just pick it up and set it aside. And when he looked down into that cup holder, he looked straight down to the trap door where the hidden compartment was. The officer at the port of entry on the day the defendant came through in the same truck said the same thing, that this cup holder was wobbly and moved really quickly. So the inference there is that this is such an obvious modification that he would have been aware of that as well. And— If two police officers noticed it, the owner of the car that had owned that car during all the period of time would have become aware of it. Yes, Your Honor. Both police officers noticed it after just a very small amount of time in the car. Also, there was the issue, if I may continue, of the subsequent license plate change. This shows multiple things. This shows knowledge and that he wouldn't really have a reason to change the license plates if not for the fact that he had a reason to believe that his car had gotten hot, gotten suspicious. But it also shows planning and preparation. And, in fact, there was no evidence at trial to show that the old license plates on the car were salvaged plates. In fact, he told Officer Morales, when Officer Morales was asking him what modifications he'd done to the truck, because Officer Mount had found the shiny new bolts and everything, he said, none. I've changed the tires, and I just put new license plates on. And so that was his own statement. He left back to Mexico, and when he came back into the United States, he had replaced those new license plates with newer new license plates. And without the 404B evidence, the fact that he had new license plates when he came in on the day he got arrested has very minimal relevance. But when you consider it in the context of that Round Rock stop and everything that transpired, his inconsistent statements, the dog alert, everything else, it very clearly, I'd submit, shows planning and preparation for the next entrance. Was there testimony about the value of the drugs that somebody put in there in this innocent person's car? Yes, Your Honor. What was the value? The value was, I think it was around $420,000. I'd mentioned it in my closing argument. It was something around $30,000 a kilo, something in that range. Was there any testimony? I don't think the defendant testified in this case. That's correct, right? The defendant testified. But was there any testimony in other cases where there's suggestion that the car was in Mexico for a period of time, that it could have been moved around, that maybe somebody worked on the car, that other people had access to it? Was there any testimony with reference to anyone having access to the car other than this owner? I don't believe so, Your Honor. That might have been a defense argument. I certainly didn't enlist any testimony. There wasn't any testimony to that? No. And there wasn't any testimony as to that he was supposed to meet someone and turn over the vehicle to somebody or that he was going to let somebody use it or somebody had used the car the day before or anything like that? No, Your Honor, nothing like that. I would mention also to you that the only case in this circuit in which evidence of an empty, hidden compartment has been rejected in a way that the appellant suggests should happen here is the Garcia-Garcia case, which is an unpublished opinion but an interesting one for us. That's the other border search. That is, Your Honor. Okay. In that case, the lady wasn't the owner of the car. She's in a different car when she gets stopped, right? Correct, Your Honor. And there's a whole lot of differences in those kinds of stuff. Correct. Other than the fact that it was unpublished. Yes, Your Honor. And there were other – as you mentioned, there were other differences. But even in that case, you, Judge Jolly, Your Honor, mentioned that that hidden compartment evidence, that there was no convincing reason to exclude it, that it was clearly relevant and highly probative. And if that evidence – if there was sufficient showing of knowledge in that case to suggest that evidence was relevant and probative, I would submit to you that here, where we have a much stronger showing of knowledge through the inconsistent statements, through the modifications, everything else, plus the planning and the preparation, that it's exceptionally relevant here. And I'd like to turn now, if I may, although the appellant didn't have a chance to address it in oral argument, she mentioned that our expert testimony was faulty. If I can turn the Court's attention to that, I would just mention that the expert testimony provided by Officer Joe Sanchez was appropriate expert testimony. All it did was – You know, all you did is just testify that this man is guilty, in my opinion, is the way I looked at it. That's the way I look at all that profile stuff. I mean, you'd ask all the questions that were evidence in this case and says, what does that mean? It means he's guilty. That's what your expert said. I don't know how y'all still get away with it. I don't know who it is on our Court that keeps laying that down. Your Honor, if I can briefly respond to that. The expert witness addressed only issues that were of pertinence in this case. Well, yeah. I mean, you said this man has been accused of having a truck that fits his profile, that is cowboys in a hat. This man had a hidden compartment. This man goes on to Hub City and then comes back. All the evidence, you just iterated the evidence and says, what does that indicate? Well, it indicates he's guilty. It indicates he fit a profile, that's for sure, but – Well, exactly. Well, but the officers have expertise. Why can't the jury know about expertise? Isn't that the point? Well, if you put it that way – I was asking him a question. I wasn't asking you to answer. Oh, well, I thought you were addressing the earlier ones to me. I mistake that. May I respond? I asked you a question, yeah. Thank you, Your Honor. It is very relevant evidence. The conclusions that Judge Jolly mentions are indeed conclusions that I – inferences that I drew in my closing argument to a large extent, but they weren't the witness's testimony. They could be cross-examined, could they not? Yes, Your Honor, they could. And each one of those subjects, the fact that hidden compartments are used by drug traffickers, the fact that you might want to change license plates – Could you suggest a cross-examination that you might make of a witness that has given a profile that the client is guilty of? Would you cross-examine that profile? I just was wondering about that. Your Honor, I've never been a defense attorney. Well, I know, but you're in the courtroom, I hope. Yes. Your Honor, I – there was ample opportunity to cross-examine on each of these issues of relevance, and at no point during Agent Sanchez's testimony did Agent Sanchez say anything about this particular appellant. Did he comment on his state of mind? Did he give anything equivalent to the functional equivalent, anything comparable to the functional equivalent? I think the question is, did your argument, though, when you sum up, are you saying that it's the functional equivalent? I mean you go through every single thing. He testified that these people do this. He did it. He testified that people – he did that. And you go through all this list and you say he meets all the tests of this profile, therefore he's guilty. Well, you pretty much used that to – why didn't that create the way you handled it to make it a functional equivalent? Well, Your Honor, a couple of responses there. One, testimony would not become – testimony that's otherwise admissible does not become inadmissible because of the inferences I draw from it at closing argument. If the testimony – we have to look at the testimony on its face. If that testimony is admissible, it's admissible. There was no objection at trial, nor is there any sort of issue on appeal about the propriety of my closing argument. In closing, I can – your point is well taken. I would suggest though that in closing I can make arguments and raise inferences based on the evidence, and all I was attempting to do in my closing argument was present the evidence in the strongest appropriate way that I could and suggest that the evidence in this case was indicative of the appellant's guilt. You just – you knocked him to the floor and then after you hit him, knocked the defendant to the floor, you kicked him. That's what you did. I mean you had the case won without having somebody testifying their expert opinion that he was guilty. Your Honor, I appreciate that sentiment. What's your best case for admitting the evidence? My best case for? Admitting the evidence. Admitting the expert testimony? Correct. Yes, sir. My best case is that each – I mean a citation. One second, Your Honor, and I will give you one. My best case for admitting it is essentially to show – is essentially the cases in which this kind of evidence has been – to show the cases in which this kind of evidence has been rejected. I believe you cite several cases in your brief, so which one do you think is most apposite here? I do. I think, for instance, Your Honor, Gutierrez-Vargas is very useful to us here in that that was a case where the expert testimony was disallowed. But in that case, the expert gave testimony that was just directly and concretely profile evidence, and we don't have anything similar to that here. In the facts in that case and in the facts of your examination here. The difference in Gutierrez-Vargas is that the witness for the government in that case said that most people hired to smuggle drugs know that there are drugs in the car. So the inference is most people know this guy had drugs in his car. Therefore, this guy knew there were drugs. That's a straight-up generalization, and that's not anything like we had in this case. I point also maybe to Gonzales-Rodriguez, in which testimony was deemed inappropriate where an expert said he would classify most people who get arrested at a Border Patrol checkpoint as smugglers. We don't have any sort of classification evidence like that, or even Moraine. In that case, the expert watched a video of the defendant, I think engaged in a drug deal or something at a gas station, or engaged in something at a gas station, and said as an expert, well, as an expert, that looks like a drug deal to me. We don't have anything like that. We don't have an expert getting on and making broad, concrete classifications like that. Wouldn't it be relevant if there had been, I mean, you know, this is a colloquy of facts and circumstances. Certainly, the agent should have been able to testify to at least one or two. For instance, in my X years of experience, they often change license plates, right? Who would object to admitting that? It's not the fact that it's not relevant. It's the fact that there was so much of it that was relevant that my colleagues object to here. And I think that's, essentially, the composite as a whole starts to look pretty suspicious. Well, it's more prejudicial than probative. It's probative and prejudicial. Unlawful prejudice, and there's lawful prejudice. Exactly. I understand, Your Honor, and Judge Benavides, to follow up on that, my hope when I introduce this evidence, and my belief as I stand here before you, is that the prejudice was the good, legitimate kind of prejudice that I try to get to prove someone guilty. Your job is to prejudice the jury against the defendant, and as long as you do it lawfully, you're doing your job. You've got to know where that line is, though. He's trying to prejudice in favor of her client. Exactly, Your Honor. That's what the practice of law is. Exactly. And Judge Jolly, Your Honor, I did my very best. He's a jury of more. That's right. That's what I'm doing all the time up here. Your Honor, it's got a cold way to look at my job, but understood. I did try my very best to stay on the proper and legitimate side with this expert testimony. Each of the issues that I brought up, I brought up because I believe that the jury would not be able to understand the significance of them without an expert to talk about them. These happen to be the issues that I talk about in my closing arguments. They happen to be some of the most important issues in my case. The fact that this gentleman used a prepaid burner phone, as we call it at trial, with very little contact information, no calls, anything like that. Nobody knows that from TV. That's hardly an expert. That may be fair, Your Honor, but I was a little reluctant to rely on the hope that everyone had seen as much CSI as I have when I went into trial. The ways that these compartments are built was useful to me, for instance, because it showed that this is not just a compartment that happens in the car and this coat just doesn't get thrown in the back of the car in a duffel bag. This is a compartment that takes months to build. You have to find a separate truck that's drummed, find people that know how to do this stuff, weld the two together, and create this void. I won't belabor each of those issues, but each one of the points that our expert witness talked about were points like that, that I thought very legitimately and very properly benefited from an expert's elucidation so they could really understand the full significance of the issues. Your Honors, I believe I'm out of time. All right, Mr. Durace. Thank you. Thank you. Counsel? I'm not sure what this says about prosecutors and defense attorneys, but I learned about burning bones on a breaking bag. There you go. I wanted to, before I run out of time talking about the profile statements, I wanted to point the Court. Mr. Golgowski is testifying about how his dog alerts. He says, first of all, the dog was inside of the car, not outside of the car. Client is outside of the car. The dog is inside of the car. He said the dog alerted by putting his nose down into the cup holder. Okay, so this is the first time in the record that the government has argued that my client necessarily knew of the dog alert. I don't think the record supports it. I think the best characterization of this record is that there's no evidence my client knew that the dog had alerted. That's how I've always stated it. I believe that's the best characterization of the record. As far as profiling, I believe that the best case for this Court is a case that was decided by you, Judge Benavides, and that's United States v. Gonzales-Rodriguez. Gonzales-Rodriguez, which was discussed at length in Medalist Cab just last year, basically parses through a whole bunch of statements that were made at trial by experts and says, these statements fall on the okay line, these statements fall on the not okay line. And what I find so helpful about that opinion is basically the Court said, when you can turn the statement into a he's guilty because he did X, that's when you have impermissible profiling testimony. So I think the burner phones are on the line. I think the compartment is perfectly permissible expert testimony. Who uses burner phones now? Everybody. Everybody? Everybody. They do? Everybody. Very, very, very common. Smugglers of people, smugglers of drugs. No, but I'm talking about what legitimate use do they have? They're very cheap. They're very cheap. I've seen a lot of kids with them, and I've often wondered whether kids use them so their parents don't know what they're doing on their phones. But that's completely off the record, but they are very cheap. You're right, Your Honor. It's a surreptitious use. Whatever you buy a burner phone for, it's a surreptitious use. Or a quick and cheap use. You may have lost your own phone if you're out of town. Very, very good point, yes. Let me ask you what we need. I'm probably least informed on this than anybody here. But I know that they have the little chip that you get for your phones. My son-in-law is from London, and he just brought my grandson to see me. And while they're here, they brought their phone, and they buy this little chip, and it lasts for a certain amount of time. And they can send text messages. Is that what you mean by a burner phone, or are you talking about the whole phone apparatus itself? It's the whole phone apparatus itself. Very simple, very drilled down to the basics, and they're usually used for single purposes and then thrown out. They're cheap. You can throw them out. Yeah, what you see on all the detective shows. Exactly. Blacklist. Exactly, or Breaking Bad where they hit it with a hammer. Yeah. Anyway, in Gonzales-Rodriguez, this court called permissible statements like, meth is produced in Mexico, drug organizations use couriers, couriers normally don't handle drugs. Why are those statements permissible? Because they help elucidate the case for the jury. They help the jury understand something that it might not understand. Here are some statements that the court in Gonzales-Rodriguez said were impermissible. Couriers generally have no criminal history. The court said that turned around, all that means is Mr. Gonzales is guilty because he has no criminal history. Couriers hide drugs in legitimate loads. In that case, it was grapefruits. The court said all that statement said was Mr. Gonzales is guilty because he was carrying fruit. Let me ask you a question. How many times did you object to this agent's testimony? Your Honor, we filed—I'm going to answer the question first. We did not object as the testimony was going on. We did file a motion in limine before trial. That motion was thoroughly litigated and it was denied. And in the interest of candor, I want to tell you that the court did give the prosecutor a warning at that moment and said you cannot specifically equate your client with a profile. But isn't it—am I not correct that even—don't you have to also object when the evidence comes in? Not under the newly—new, I call it new because I'm old. In 2000, I believe. It's either 1999 or 2000 that 103 was amended. Well, let me just ask you this because it does seem to me that you are breaking this agent's testimony down into a bunch of component parts, some of which you acknowledge are okay. And so how does your global objection to that testimony preserve an objection to the separate part? I think it's a close case. I think we cited to the court all of the relevant decisions that would help the trial court know what side of the line. And the courts—I'm sorry. That's okay. I'm sorry. I'm talking about preservation of error. Because you have to—I don't think they changed the rule that you still have to object distinctly to what you find objectionable or admissible. What the rule now says is that if your argument is that the—you're fine with the written motion. If your argument—I know this because I've had to fess this up before. If your argument is that the other side exceeded the scope of the court's ruling, then you have to make a separate exception. I would argue, and again I concede it's a close case, that in this case our argument was that the court's ruling in the beginning was improper. Because what the court said was you cannot let your witness explicitly equate. Well, that's not the law. Implicit equation is bad enough. And we cited the cases that hold that proposition in our motion in limine. It's a fine point, but I think it's a point worth considering, especially given that on a case that was—I'm not saying he would have lost, but he had a so-so case on knowledge. He tried a prior offense, and he gave extensive expert testimony that our client was guilty because he fit a profile. I think on those circumstances, finding error, plain or otherwise, is probably what this court ought to do. Okay. Thank you, Ms. Kalfa. Thank you so much. We both argue for good arguments that are helpful to the court.